E-FILED
Monday, 11 July, 2011  11:56:50 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| Prospect Enterprises, L.L.C., <br>                 Plaintiff <br> v. <br> Donald N. Ruff, Jr. and Annette Ruff, <br>                 Defendants | Case No. 10-1026 |

## OPINION
### and
## JUDGMENT ORDER

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. The case was tried before the bench on May 2, 2011. The parties have each submitted post-trial briefs, and I have carefully considered the arguments made therein and the testimony and evidence produced at trial.

**FINDINGS OF FACT**

Prospect Enterprises L.L.C. ("Prospect") owns a condominium development in Peoria Illinois known as The Townhomes of Williamsburg. Edward Sutkowski ("Edward") and his wife Linda Bruniga Washkuhn Sutkowski ("Linda"), are two of the owners of Prospect. Edward makes financial decisions for Prospect.

At the time of trial in this matter, the development contained 33 townhome units. Of the 33 units, 28 are completely finished and are available for sale. The remaining 5 units are built but not complete; they are not yet available for sale. By the end of 2009, 13 of the 33 units had been sold. Prospect was actively involved in sales efforts at the time, and has remained active from then until the date of trial. Since the end of 2009, Prospect has sold only two of the remaining units; 18

available units remain available for sale, including Unit 3319. Sale of these units was adversely affected, according to Edward, by the economic downturn.

Donald and Annette Ruff are a married couple. In June of 2008, Donald was laid off from his employment as a contract engineer at Ford Motor Company in Michigan. In October, he was recruited and then hired by Caterpillar. He did not sign an employment contract with Caterpillar. The terms of his hire, however, were very favorable. All expenses related to his move were reimbursed, including loss of value from the sale of his home; these expenses were valued at $55,000. The salary was generous. Donald believed that he would finish his career at Caterpillar.

In preparation for the Ruffs' move to the Peoria area, they visited the Townhomes at Williamsburg. At the time of this visit, the Ruffs were trying to sell their house in Michigan. They did not wish to purchase one of the units until their house sold. They inquired about renting one of the units, but were told that Prospect did not rent any of its units. However, Prospect also told them that if they agreed to purchase the unit in which they had shown an interest (referred to herein as "Unit 3319"), Prospect would allow them to rent Unit 3319 until July 31, 2009. This would, everyone hoped, give them time to sell the Michigan house. A verbal agreement for the rent and sale price was reached.

Edward, who is an attorney, prepared a written agreement to memorialize the verbal agreement. As is pertinent here, the written Lease/Purchase Agreement ("Agreement") identified the Seller (Prospect) and the Buyers (Donald and Annette Ruff) and provided as follows:

> **Lease Term**: Buyer shall lease the Unit from Seller on the terms described in the following paragraph during the period beginning on November 1, 2008, and ending on the first to occur of: (a) July 31, 2009, or (b) the date upon which Buyer elects to close the purchase of the Unit.
>
> Buyer shall: (a) pay Seller rent computed at the rate of $900 per month...; (b) pay all utilities

2

...; (c) maintain the interior of the unit...; (d) install Buyer's kitchen appliances and washer and dryer at Buyer's cost ...; and (3) maintain and provide Seller with evidence of liability and fire insurance in respect of the interior of the Unit.

**Purchase Price**: $135,500, less $1,000 earnest money deposit.

**Closing Date:** Not later than July 31, 2009

**Pre-Closing: Seller Deliveries:** (a) [Condominium-related documentation]

**Closing: Seller Deliveries:** (a) Warranty Deed ... (b) Title Insurance Policy ... (c) evidence of compliance with the Real Estate Settlement Procedures Act of 1974, as amended; and (d) such other instruments required by Buyers' lender, if any, to conclude the transaction

**Closing: Buyer Deliveries:** (a) certified funds in the amount of the Purchase Price; (b) evidence of compliance with the Real Estate Settlement Procedures Act of 1974, as amended; and (c) such other instruments required by Buyers' lender, if any, to conclude the transaction.

Edward sent the Agreement to the Ruffs. The Ruffs each signed the Agreement on October 19, 2008, and returned it to Prospect with a check for the earnest money. Donald then moved into the unit, while Annette remained in Michigan to sell the house there. Donald purchased and installed appliances.

About four months later, Donald was laid off by Caterpillar. Although the Michigan house had sold at about the same time, Donald's unemployment created problems for the Ruffs in obtaining financing and closing on the sale. Donald sent a letter to Prospect sometime between April 28 and June 10, 2009. The letter read in pertinent part, "We have sold our house. ... Since I am not back to work, I have not been able to get a mortgage for the townhouse. Cat has not given me any idea on when they expect to call me back to work." Both Donald and Edward understood this letter to mean that the Ruffs would not be able to close the transaction until Donald was called back to work.

Edward sent an email to his assistant Donna Cleer on June 29, 2009, stating that there would

be no closing in July. July 31, 2009, came and went with no further communication between the parties to the Agreement. Donald continued to live in Unit 3319, paying the $900 monthly rent. Because Edward believed Donald would be called back by Caterpillar or that he would find other employment in the Peoria area, he was willing to defer the July 31 date to allow the Ruffs additional time; he did not, however, discuss this with the Ruffs. No documents for closing were prepared by Prospect, because Edward thought preparing them would have been a waste of time under the circumstances. Obviously, the Ruffs did not ask that the closing documents be prepared.

In October 2009, Donald received a letter from Caterpillar, advising that he would not be called back to work and that his employment was terminated. Donald then sent another letter to Prospect, dated October 29, 2009, advising Prospect of this new development and stating that he "will no longer be able to afford the townhouse." The letter concluded, "My intention is to move my belongings back to Michigan, and to have the place cleaned and ready for your inspection by the 1st of December."

Edward responded by letter dated November 4, 2009. In that letter he referred to the Agreement as providing for closing "upon the first to occur of the dates mentioned." He went on, "With a view toward minimizing your loss by reason of your failure to close the transaction - the contract does not contain any condition associated with your continued employment with Caterpillar - please call at your convenience." The letter also mentioned that the Ruffs had missed their October rent payment; a check the Ruffs sent later bounced, and was never made good.

Neither of the Ruffs called Edward in response to this letter. Donald moved out of Unit 3319 sometime in November. Prospect never tendered closing documents, based on Edward's belief that it would be futile given Donald's statement that they could no longer afford the Unit. The Ruffs

4

never closed on the purchase of the Unit or paid the remaining $134,500 of the purchase price.

In addition to the lost sale price and the skipped rent payment, Prospect has incurred other expenses connected to Unit 3319. Those expenses include: real estate taxes ($5,614.62), common area expenses ($1,394.00), interest expense ($7,145.31); utility expenses ($788.76) and sanitary district expense ($26.24), for a total of $14,968.93.

Prospect filed this lawsuit on January 29, 2010. The one-count complaint seeks specific performance of the Agreement.

## CONCLUSIONS OF LAW

### *SPECIFIC PERFORMANCE GENERALLY*

Specific performance is an equitable remedy requiring a defendant to perform an affirmative act in order to fulfill a contract. See, Hoxha v. LaSalle Nat. Bank, 847 N.E.2d 725, 729 (Ill.App. 2006); Schwinder v. Austin Bank of Chicago, 809 N.E.2d 180 (Ill.App.2004); McCormick Road Associates L.P. II v. Taub, 659 N.E.2d 52 (Ill.App.1995); Dixon v. City of Monticello, 585 N.E.2d 609, 610 (Ill.App.1991).

Where a specific and unambiguous written contract for the sale of real estate has been entered into fairly and understandingly, each party is entitled to specific performance of the contract as a matter of right. Curtis Casket Co. v. D.A. Brown & Co. 632 N.E.2d 204, 208 (Ill.App. 1994), citing Young v. Kich, 15 N.E.2d 692 (Ill.1938). Generally, contracts to convey real estate will be enforced by specific performance on the grounds that perfect justice cannot be done at law. Dixon, 585 N.E.2d at 610. The remedy is available to either the buyer or the seller. Nave v. Heinzmann, 801 N.E.2d 121, 126 (Ill.App.2003).

To state a cause of action for specific performance, a plaintiff must allege: (1) the existence

of a valid, binding, and enforceable contract; (2) compliance by the plaintiff with the terms of the contract, or proof that the plaintiff is ready, willing, and able to perform the contract but was prevented and thus is excused from doing so by acts of the other party; and (3) the failure or refusal of the defendant to perform his part of the contract. Hoxha, 847 N.E.2d 725.

For a contract to be specifically performed, it must be so certain and unambiguous in its terms and in all its parts that a court can require the specific thing contracted for to be done. Schilling v. Stahl, 918 N.E.2d 1077, 1080 (Ill.App.2009), citing Cefalu v. Breznik, 154 N.E.2d 237 (Ill.1958). It is not sufficient to show the existence of some kind of agreement between the parties; where there is ambiguity, doubt, or uncertainty with respect to its terms, equitable enforcement by specific performance will be denied. Schilling, 918 N.E.2d at 1080; Cefalu, 154 N.E.2d 237.

Prospect argues that it has performed all conditions precedent to the Ruffs' performance and that it performed all of its obligations under the Agreement. It remained ready, willing and able to sell Unit 3319 to the Ruffs, before and after July 31.

The Ruffs present a number of arguments as to why specific performance should not be ordered under the circumstances of this case. First, they assert that Prospect's unilateral decision to extend the closing date constituted a prohibited oral modification of a written contract and is therefore barred by the Statute of Frauds. Second, the Ruffs argue that the unilateral change of this term of the contract by Prospect means that there was no meeting of the minds as to that term, so the attempted modification fails as a new contract. In the absence of an enforceable contract, the Ruffs conclude that specific performance is not an available remedy. Third, the Ruffs contend that Prospect failed to perform its contractual obligations. Finally, the Ruffs argue their performance was excused under the theory of impossibility. In addition, the Ruffs challenge Prospect's claim for

6

damages.

## *STATUTE OF FRAUDS*

Under Illinois law, generally a written contract within the Statute of Frauds may not be modified by an oral agreement. Melrose Park Nat. Bank v. Carr, 618 N.E.2d 839 (Ill.App.1993); Nelson v. Estes, 507 N.E.2d 530 (Ill.App.1987). A writing sufficient to satisfy the Statute of Frauds need not itself be a valid contract, but only evidence of one. Crum v. Krol, 425 N.E.2d 1081 (Ill.App.1981).

The first letter sent by Donald to Prospect contains nothing in it indicating an intention to back out of the Agreement. From that letter, the only reasonable inference that can be drawn is that Donald hoped the July 31 date would be extended. Edward's decision to informally extend the closing deadline was not unilateral; it arose from the implicit suggestion in Donald's letter that he do so. As Donald's intention was sufficiently clear and was in writing, Edward's extension of the closing date did not violate the Statute of Frauds.

## *MEETING OF THE MINDS*

For the same reason that the Ruffs' Statute of Frauds argument fails, its argument that there was no enforceable contract after July 31 also fails. First, as shown above, the extension of the July 31 date was not unilateral. It was suggested by Donald's first letter and was assented to by Edward's conduct. Moreover, it was not until the October letter that Donald suggested in any way that he was backing out of the purchase, as opposed to simply deferring the closing. Until that October letter, his conduct was entirely consistent with assent to an extension of the closing date.

There was a meeting of the minds as to the extension. The contract did not, as suggested by Defendants (without any authority) simply "expire" on July 31. Given the relevant facts - Donald's

language in the first letter, his continued residence in and payment of rent for Unit 3319 - it would be wholly unreasonable to conclude that the Agreement became a nullity on August 1. I conclude that the Agreement continued to be binding, valid and enforceable beyond July 31.

### *PROSPECT'S PERFORMANCE OF CONTRACTUAL OBLIGATIONS*

The Ruffs also assert that Prospect failed to provide them with a copy of the deed and by-laws, the Articles of Incorporation, or a warranty deed or title insurance. This failure, according to the Ruffs, contradicts Prospect's insistence that it was always ready, willing and able to perform.

There are several problems with this argument. First, Prospect alleged in paragraph 9 of the Amended Complaint that it had performed all conditions precedent required by the Agreement. In their Answer, the Ruffs stated simply, "Defendants neither admit nor deny the allegations contained therein." Such an answer is not a proper answer under the Federal Rules of Civil Procedure, which require that a party either admit or deny allegations asserted against it, unless knowledge is lacking, in which case the lack of knowledge must be stated. "An allegation ... is admitted if a responsive pleading is required and the allegations is not denied." Fed.R.Civ.P. 8(b)(6). By failing to deny the allegation, the Ruffs effectively admitted it.

Moreover, the case law cited by the Ruffs does not support their position. In Maros v. Jones, 286 N.E.2d 819 (Ill.App.1972), suit was brought against a real estate broker by purchasers of real estate. The purchasers had entered into a purchase agreement, paying $5,000 earnest money. The agreement required the seller to convey a "recordable" deed. The real estate had never been subdivided, and the financer refused to provide funds unles a subdivision plat was filed. The seller did not file a subdivision plat. Suit was filed to obtain return of the earnest money. The seller contended that the buyers were required to make an actual tender of the purchase price. The Court

held, "in the case of mutual and concurrent promises it is only necessary the plaintiffs show they were ready, willing and able to perform if the defendants were also ready to perform." Id. at 823. The Court went on to quote the venerable Illinois Supreme Court case, Clark v. Weis, 87 Ill. 438, 1877 WL 9875, *2 (1877) as follows:

> Some misapprehension or confusion appears to have arisen from the mode of expression used in the books in treating of the necessity of a tender or offer by the parties, as applicable to the case of mutual and concurrent promises. The word 'tender,' as used in such a connection, does not mean the same kind of offer as when it is used in reference to the payment or offer to pay an ordinary debt due in money, where the money is offered to a creditor who is entitled to receive it, and nothing further remains to be done, and the transaction is completed and ended; but it only means a readiness and willingness, accompanied with an ability on the part of one of the parties, to do the acts which the agreement requires him to perform, provided the other will concurrently do the things which he is required by it to do, and a notice by the former to the latter of such readiness. Such readiness, ability and notice are sufficient evidence of, and indeed imply, an offer or tender in the sense in which those terms are used in reference to the kind of agreements we are now considering. It is not an absolute, unconditional offer to do or transfer anything at all events, but it is, in its nature, conditional only, and dependent on, and to be performed only in case of, the readiness of the other party to perform his part of the agreement."

The evidence in this case clearly shows that Prospect would and could have delivered what it was contractually obligated to deliver, had the Ruffs themselves been ready to perform. Because the Ruffs were not ready to perform, Prospect was not obligated to physically tender anything, and their failure to do so was not a failure to perform obligations under the contract.

Finally, it can also be said that the law does not require the doing of a futile act. Hardy v. City Optical Inc., 39 F.3d 765, 770 (7th Cir. 1994)(citing cases). Because Prospect knew that the Ruffs could not obtain financing by July 31, preparing the closing documents would have indeed been futile. This became doubly true once the October letter was sent: with that letter, the Ruffs had unqualifiedly repudiated the Agreement, making further tender of performance by Prospect unnecessary.

For any one of these reasons, I conclude that Prospect performed its contractual obligations. There was no failure on the part of Prospect that excused performance by the Ruffs.

## *IMPOSSIBILITY OF PERFORMANCE*

The Ruffs assert that their performance was "negated under the theory of impossibility." The need for a contingency provision in the Agreement could not be foreseen because of the significant investment made by Caterpillar to bring Donald to Peoria. Hence, when the unforeseen actually happened, it rendered their performance "impossible."

In Shedd-Bartush Foods of Ill. v. Commodity Credit Corp., 135 F. Supp. 78 (D.C.Ill.1955), the plaintiff contracted for the sale and purchase of a product manufactured by the defendant. When the ceiling price for one of the manufacturing components were lifted by the Office of price administration, the product's price increased substantially and the plaintiff suffered a loss in fulfilling the contract. The Court held that performance may be excused "where a very great increase in expense is caused by a circumstance not only unanticipated but inconsistent with facts which the parties obviously assumed as likely to continue." Id. at 89. The Court found that the contracting parties had had every reason to anticipate that the price ceilings might be lifted. Performance was not, therefore excused.

In Consolidated Laboratories, Inc. v. Shandon Scientific Co., 413 F.2d 208 (7th Cir.1969), an Illinois distributor sued a British manufacturer for breach of a 5 year exclusive distributorship contract. Problems arose and the parties then entered into a letter of intent providing that the Illinois distributor would continue in that role until a new main distributor was named, at which time the Illinois distributor would become a primary dealer of, rather than a distributor for, the products. Instead of naming a new distributor, the company organized an American subsidiary and then

10

terminated the letter of intent. The manufacturer asserted that appointing a new distributor was "impractical," an argument which the Seventh Circuit rejected, holding: "Mere unanticipated difficulty, inconvenience, unexpected expense, loss, or improvidence will not excuse failure to perform a contract according to its terms." Id. at 212.

The Consolidated Laboratories Court relied on Levy v. Rosen, 21 N.E.2d 653 (Ill.App.1939) for that holding. In Levy, the Court carefully examined Illinois' law of impossibility, noting that impossibility means not only strict impossibility "but impracticability because of *extreme and unreasonable difficulty, expense, injury or loss involved.*" Id. at 656 [emphasis added]. The Court went on to quote the Restatement for the proposition that "mere unanticipated difficulty, however, not amounting to impracticability is not within the scope of the definition." Id.

These cases and others discussing the theory of impossibility make it clear that more is needed than a present inability to perform due to financial difficulty. The inability to perform must arise from unforeseeable events that result in extreme and unreasonable expense. For example, performance was impossible when a wartime embargo prevented a ship from completing its voyage. Allanwilde Transport Corp. v. Vacuum Oil Co., 248 U.S. 377, 385-86 (1919);

In the absence of such conditions, the risk of inability to perform goes to the very nature of a contract: the parties agree either to perform or to pay. As the Seventh Circuit has explained, the idea behind the doctrine is that the parties, had they anticipated the event that has made performance "infeasible or fearfully burdensome," would have excused performance. Wisconsin Elec. Power Co. v. Union Pacific R. Co., 557 F.3d 504, 505 -506 (7th Cir.2009), quoting Northern Indiana Public Service Co. v. Carbon County Coal Co., 799 F.2d 265, 276-78 (7th Cir.1986). "Impossibility is thus a doctrine for shifting risk to the party better able to bear it, either because he is in a better position

to prevent the risk from materializing or because he can better reduce the disutility of the risk..." Id. at 277, quoted in Wisconsin Elec. Power, 557 F.3d at 506.

The Ruffs knew that Donald's employment with Caterpillar was at-will employment. Despite hopes - even reasonable hopes - that he would continue to work at Caterpillar, it can only be said that he - and not Prospect - took the risk that his employment might end. The Court knows of no real estate agreements that are contingent on the continued employment of the purchaser. A seller of real estate is not the insurer of the buyer's employment or of the buyer's continued ability to pay.

Loss of employment in the context of this case simply does not rise to the level of "extreme and unreasonable." It was certainly a foreseeable possibility at the time Donald entered into the agreement, and he nonetheless undertook the obligation to purchase unit 3319. The fact that his financial circumstances changed did not make his performance "impossible" or "impracticable" under the law.

### *ORDER OF SPECIFIC PERFORMANCE*

Prospect has met its burden of showing that it is entitled to specific performance of the Agreement. It is therefore ordered that the parties set a date for closing within the next 45 days and that the Ruffs complete their obligations under that Agreement.

### **DAMAGES**

In addition to specific performance, Prospect seeks compensatory damages. When specific performance will not provide complete relief, the injured party is entitled to those damages that will make him whole, including monetary damages incidental to and caused by a delay in performance. Mandel v. Hernandez, 936 N.E.2d 1079, 1083-1084 (Ill.App. 2010). The injured party is entitled to damages incurred between the time of breach and the time of performance if those damages arose

naturally from the breach or were reasonably foreseeable at the time the contract was executed. Id. [citations omitted].

The Ruffs challenge Prospect's ability to obtain any damages based on the "uniqueness" of Unit 3319. That challenge is beside the point. As demonstrated above, Prospect is entitled to specific performance of the Agreement, making unnecessary an award of "damages" for the amount due under that Agreement. The amount of the purchase (less the earnest money) is due not as damages but as specific performance of the Agreement.

The remaining damages sought - for taxes, maintenance and the like - were well documented and have not been challenged. Accordingly, in addition to specific performance, compensatory damages are awarded as follows: real estate taxes ($5,614.62), common area expenses ($1,394.00), interest expense ($7,145.31); utility expenses ($788.76) and sanitary district expense ($26.24), for a total of $14,968.93.

## CONCLUSION

The Clerk is directed to enter Judgment in a Civil Case in favor of Plaintiff and against Defendants. Plaintiff is awarded specific performance of the Lease/Purchase Agreement and compensatory damages in the amount of $14,968.93.

ENTERED ON July 11, 2011

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE